# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

MHDE ASKAR

CRIMINAL COMPLAINT

CASE NUMBER: 08CR 0036

FILED
KC
JAN 16 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __December 27, 2007__ in __Cook__ county, in the __Northern__ District of __Illinois__ defendant(s) did, (Track Statutory Language of Offense)

devise a scheme to defraud and to obtain money by means of materially false and fraudulent representations and promises and, for purposes of executing such scheme, knowingly caused a wire to be transmitted in interstate commerce for the purpose of executing such scheme and artifice to defraud, namely, an email sent from Chicago, Illinois through New York and California containing as an attachment a Uniform Residential Loan Application for the purchase of real property located at 7952 S. Chappel Ave., Chicago, IL 60617;

in violation of Title __18__ United States Code, Section(s) __1343__.

I further state that I am a(n) __Special Agent, FBI__ and that this complaint is based on the following facts:
Official Title

See attached Affidavit.

Continued on the attached sheet and made a part hereof:  __X__ Yes  ___ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

January 16, 2008                at      Chicago, Illinois
Date                                    City and State

Michael T. Mason, U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer           Signature of Judicial Officer

## AFFIDAVIT

| | |
|---|---|
| **STATE OF ILLINOIS** | ) |
| | ) SS |
| **COUNTY OF COOK** | ) |

STEVEN T. SECOR, being duly sworn on oath, deposes and states as follows:

1. I am a Special Agent with the Federal Bureau of Investigation and have been so employed since approximately September 2003. In September 2003, upon graduation from the FBI Academy, I was assigned to the Indianapolis Field Office of the FBI where I was assigned to a white collar crime squad. My work on the white collar crime squad in Indianapolis included, but was not limited to, investigations concerning bank fraud, wire fraud, mail fraud, money laundering, and conspiracies to commit these criminal violations. In August 2006, I was transferred from the FBI's Indianapolis Field Office to the FBI's Chicago Field Office. I was assigned in Chicago to a white collar crime squad primarily devoted to investigating financial institution fraud. In this assignment, I have investigated all manner of crimes against financial institutions including mortgage fraud, bank fraud, wire fraud, mail fraud, money laundering, and conspiracies to commit these criminal violations.

2. This affidavit is based on my own personal investigation as well as on information conveyed to me by other law enforcement officials, by witnesses, and by my review of records, documents, and other physical items obtained during this investigation.

3. The information contained in this affidavit is provided for the limited purpose of establishing probable cause for a violation of Title 18, United States Code, Section 1343 by defendant MHDE ASKAR and does not contain all the details and facts concerning this investigation.

4. The FBI has been working with a confidential informant ("CI") in connection with the transactions described in this affidavit. The CI told the FBI that in approximately 2006 ASKAR had arranged for him/her to qualify for two mortgages for which the CI would not otherwise have qualified in order for the CI to purchase two pieces of real property. The CI told the FBI that, at the time the CI acquired the mortgages, the CI's income was approximately $40,000. The CI reported that, through ASKAR's efforts, despite the fact that the CI was the purchaser of the property, the CI received approximately $10,000 from the mortgage loan proceeds on the properties to which he/she was not entitled based on the disclosures made in the closing documents. The CI stated that ASKAR received a commission on the CI's purchase of the properties. The CI told the FBI that the CI, through ASKAR, sold the properties a short time later before there was any foreclosure on the properties. The CI informed the FBI that he/she did not make the mortgage payments on these properties before selling them even though the properties were in the CI's name. The CI also told the FBI that, to the CI's knowledge, ASKAR made the mortgage payments or caused the payments to be made.

5. Based on my training and experience, I have learned that the purchaser of real property may receive cash back at a closing but any such cash is for the specific purpose of providing funds for construction on the property acquired. The lender is aware that the loan proceeds reflect an amount that is specifically targeted to cover these construction costs. The proceeds for this type of "construction credit" are typically placed by the lender into an escrow account which is monitored by the lender. Under this arrangement, the proceeds in the escrow account would be disbursed as invoices were presented for construction services.

6. In or around November 2007, at the request of the FBI, the CI contacted ASKAR and asked ASKAR if there was a way that the CI could again make money by acquiring property in the CI's name. ASKAR agreed to meet with the CI to discuss the CI's purchase of additional properties.

7. The FBI prepared monthly statements dated September 30, 2007 and October 31, 2007 purporting to reflect activity in Checking Account No. xxxxxx8153 in the CI's name at North Community Bank in Chicago, Illinois. The September 30, 2007 statement reflected a beginning balance of $42,543.02 and an ending balance of $2,193.42. The September 30, 2007 statement reflected the direct deposit of two payroll checks each in the amount of $2,396.51. The October 31, 2007 statement reflected a beginning balance of $2,193.42 and an ending balance of $102.28. The October 31, 2007 statement reflected the direct deposit of two payroll checks each in the amount of $2,396.51.

8. On or about November 10, 2007, ASKAR met the CI at the Family Palace Restaurant in Harwood Heights, Illinois. The CI was wearing a hidden recording device and recorded the audio portion of the conversation. ASKAR asked the CI if he/she needed "to money up." ASKAR told the CI that he could get the CI cash. The CI told ASKAR that he/she did not have money for a down payment. ASKAR told the CI that he could set the CI up with a property where the CI got cash back out of the closing but ASKAR warned the CI that he/she would not be able to "flip" the property in the current environment. The CI asked ASKAR how ASKAR had handled their prior real estate transactions. ASKAR responded, "How? We pulled strings. Forget how we did it." ASKAR told the CI that there was no more "zero percent down." The CI confirmed that he/she had only been with his/her current job for the past six months. ASKAR responded in substance: "That's the problem. You need to pick up another job, you know?" ASKAR asked the CI if he/she knew

anybody that could get the CI a job. The CI asked ASKAR what job ASKAR gave the CI the last time. ASKAR stated, "I don't have my office any more to pick up the phone and say [he/she] works for me, you know." The CI understood ASKAR to be referring to prior applications in which ASKAR, on the CI's behalf, had attributed fictitious employment to the CI and had personally verified the fictitious employment to lenders. The CI told ASKAR that his/her rent was $400. ASKAR asked how much the rent was with the CI's two roommates. The CI responded "[a]bout 1200 total." ASKAR stated "12 total. Nice." ASKAR told the CI that ASKAR had a couple of "rehab" properties that ASKAR could give to the CI "at a discount." ASKAR assured the CI that he had already fixed up the properties "100 percent." ASKAR asked if the CI had "30 grand" and the CI responded, "I don't have shit." ASKAR explained, in substance, that the property was going to be worth "250" but that the CI would get it for "like 185." The CI asked for clarification on how the CI, as the purchaser, would get cash from the closing. ASKAR responded with the following example: "Say a house is worth 100,000....You're getting the discount price....80,000 is what you get, right? You're getting a loan for 100,000. But the discount price is 80, so anything over the 80 is what you get, you get it?" ASKAR assured the CI that this structure, even though the CI was "takin' the money" was legal. ASKAR asked the CI how much money the CI needed and the CI responded, "[f]or a good down payment on my own condo, probably about 20 [$20,000]." ASKAR emphasized that the property he had in mind was "investment property" that was "completely rehabbed, beautiful."

9.   On or about November 10, 2007, after the meeting at the Family Palace Restaurant, the CI dropped ASKAR off at ASKAR's residence located at 5133 North McVicker Avenue, Chicago, Illinois. The CI asked if ASKAR still had the CI's information from the last transactions

or if ASKAR had "trash[ed] all that shit?" ASKAR responded "[a]ll that shredded a hundred percent. Make sure you [the CI] shred anything you had for that property too. Everything that you had to do with any properties....You don't [want] any information laying around. You never know. Alright?"

10. On or about November 20, 2007, ASKAR met the CI at a Subway Restaurant in Chicago, Illinois. The CI was wearing a hidden recording device and recorded the audio portion of the conversation. The CI asked ASKAR how the CI was going to make money by taking out a loan to buy property. ASKAR stated that the CI was looking at something like $45,000 to $50,000 being returned to the CI based on a loan of $300,000. ASKAR told the CI not to worry about getting money back because the CI was going to set up a business. ASKAR asked if the CI's sister had a business and emphasized that the money the CI received from the closing could not be in the CI's name. ASKAR told the CI that if the money were given in the CI's name "then you're really doing something illegal because you can't get any money back. It has to be a third party." ASKAR suggested to the CI that any company the CI set up have the word "construction" as part of the name. ASKAR also told the CI that the CI needed to have someone the CI trusted to cash the check that would be issued in the company's name at the closing. The CI understood that ASKAR wanted the CI to use the name of a fictitious company so as to disguise the fact that the money returned at the closing would be given directly to the CI and was not payment for any construction on the property. ASKAR told the CI that the figure for the new property under consideration was $55,000 to set the CI up ($325,000 minus $270,000). ASKAR explained that the property was a two flat and that feature, *i.e.*, multi-unit rental property, was what would get the CI cash. ASKAR identified the property under discussion as being located at 7952 South Chappel, Chicago, Illinois (the "Chappel

5

Property"). ASKAR told the CI toward the end of the meeting that ASKAR went to bed at night at approximately 3:30 or 4:00 a.m. and that he watched the news and got a lot of his work done.

11. On or about November 20, 2007, after meeting ~~the meeting~~ at the Subway Restaurant, the CI drove ASKAR to ASKAR's residence at 5133 North McVicker Avenue, Chicago, Illinois. Surveillance agents noted that a second floor light came on moments after ASKAR entered the residence.

12. On or about November 26, 2007, the CI drove to ASKAR's McVicker residence. Surveillance agents observed ASKAR leave the residence with papers in his hand when the CI arrived. ASKAR got inside the CI's car. The conversation was recorded. ASKAR and the CI discussed the CI's purchase of the Chappel Property. ASKAR explained that the CI would not have to have reserve cash in an account for the purchase because the CI had to give ASKAR a deposit. ASKAR explained that the CI would not have to give the deposit until the closing but that for now the deposit was on paper for $3,000. ASKAR told the CI that the $3,000 was considered the CI's assets. ASKAR described the Chappel Property as having a "325" purchase price and "$3,000 earnest money." ASKAR told the CI that the CI was getting the property for "275." ASKAR asked if the CI wanted to do a second deal. ASKAR explained that, if the CI did two deals, the CI might be looking at another $40,000 to $50,000.

13. On or about November 26, 2007, the CI gave to ASKAR the following documents:

   a. Copies of the September 30, 2007 and October 31, 2007 North Community Bank statements prepared by the FBI.

   b. A copy of the CI's actual Form 1040A U.S. Individual Income Tax Return from 2005 which reflected wages, salaries, and tips in the amount of approximately $40,069.

      c.      Copies of the CI's two actual W-2 and Wage Summaries from 2006 reflecting a total of $58,309.47 in wages, tips and other compensation for that year.

      d.      Copies of the CI's actual paycheck statements for the periods 10/16/07-10/31/07 and 11/01/07-11/15/07. Each paycheck reflected a gross amount of $3,750 and a net amount of $2,396.51. The statements also reflected that the amount of $2,396.51 was directly deposited into the CI's savings account as to each pay period. The CI's total annual gross salary, based on these figures, was $90,000.

14.    Surveillance agents observed ASKAR leave the CI's car with papers in his hand and, with the papers still in hand, reenter the McVicker residence.

15.    The CI gave to the FBI the papers ASKAR had in his hand when he left the McVicker residence on November 26, 2007. The papers consisted of a "Real Estate Contract–Residential" ("Chappel Contract") for the purchase of property located at 7952 South Chappel, Chicago, Illinois. The Chappel Contract listed the purchase price for the property as $325,000. The Chappel Contract reflected that the Seller had accepted the contract on November 17, 2007. The Chappel Contract contained at the end the handwritten notation "Seller agrees to a 5,000 closing cost credit, towards purchaser." The Chappel Contract identified the seller as "Chap Property LLC." The Corporate Records and Business Registrations database of Westlaw reflects that "Chap Property LLC" was incorporated in Illinois on or about April 23, 2007. "Mhoe Askar" is listed as the manager and registered agent of "Chap Property LLC."

16.    The Chappel Contract represented that the Seller's Attorney, Attorney A, held a $3,000 check reflecting initial earnest money. The CI had never given any money to ASKAR in connection with the Chappel Contract.

17. On or about December 7, 2007, ASKAR met the CI in ASKAR's 2004 Lexus LS430 (VIN JTHBN36F940138616) outside of the CI's place of employment in the Chicago area. The CI was wearing a hidden recording device and recorded the audio portion of the conversation. ASKAR talked to the CI about the information which would be placed on the CI's loan application for the Chappel Property among others. ASKAR, for example, asked the CI questions about the CI's current employment. ASKAR described how much money the CI, as the purchaser, could expect to receive back in cash from the Chappel Property as well as two other properties that were available through ASKAR for the CI to purchase at or around the same time. ASKAR told the CI that he (ASKAR) would get a cashier's check in the approximate amount of $35,000 and deposit the money into the CI's account in order to cover the down payment. ASKAR asked for the name of the company the CI was going to use in connection with the property purchase. ASKAR also told the CI how the CI's landlord should answer questions from a lender so that the lender would only be told that the total rent on the CI's apartment, which was paid in part by two other roommates, was $1,200, and not that the CI only paid $400 each month of that amount. ASKAR also told the CI that nothing left ASKAR's house without being shredded. ASKAR told the CI that he would deposit the down payment in the CI's account the next day.

18. At one point during the conversation on or about December 7, 2007, ASKAR placed a telephone call to a representative of Mortgage Direct. The CI understood Mortgage Direct to be one of the lenders that ASKAR had contacted about the CI's purchase of the Chappel Property. ASKAR placed the call on speaker phone. The CI heard ASKAR confirm details about the CI's loan application and ASKAR at times asked the CI to confirm certain details about, among other things, the name of the CI's employer.

19.     The FBI confirmed that ASKAR did not deposit any money into the CI's bank accounts on or about December 8, 2007. The FBI determined, however, that the CI's name was added to an account also bearing ASKAR's name at Chase Bank in Chicago, Illinois which, as of January 15, 2008, had a balance of approximately $112,000. The CI told the FBI that he/she was not aware of his/her name on this account and that ASKAR had not told the CI about this account.

20.     On or about December 27, 2007, at approximately 16:54:05, the CI received an email from "mhdeaskar@yahoo.com." The FBI determined through analysis of, among other things, the IP addresses associated with the email, that the email originated in Chicago, Illinois and was initially routed through a server in New York, New York. The analysis revealed that the email was then routed through a Hotmail server located in San Francisco, California when being received by the CI's Internet account.

21.     The email from "mhdeaskar@yahoo.com" forwarded to the CI a "Uniform Residential Loan Application" ("Chappel Loan Application") for the property located at 7952 South Chappel Avenue, Chicago, Illinois. The Chappel Loan Application contained the CI's name as the "borrower" and requested a mortgage loan in the amount of $302,575. The Chappel Loan Application included the following representations which did not accurately reflect the information the CI had given to ASKAR or that the CI had told ASKAR about the CI's intended use of the property or the CI's financial condition:

| | **Loan Application Representation** | **Information Provided to ASKAR** |
|---|---|---|
| a. | The property at 7952 South Chappel would be the CI's primary residence. | On or about November 10, 2007, when describing proposed real estate purchases, ASKAR told the CI he was talking about "investment properties" and not about the CI's desire to purchase a personal use condominium. |
| b. | The CI's "Base Empl. Income" for gross monthly salary was $8,500. | The CI gave ASKAR his/her actual paycheck statements which reflected that the CI received a gross monthly salary of $7,500. |
| c. | The CI had a monthly housing expense of $1,200 in rent. | The CI told ASKAR that he/she paid $400 each month in rent but that the total rent for all three tenants (including the CI) was $1,200. |
| d. | The CI's Checking Account No. xxxxxx8153 at North Community Bank had a cash or market value of $25,000. | The checking account statement dated 10/31/07 reflected a balance of $102.28. |
| e. | The CI had an account at North Community Bank with a cash or market value of $75,000. (The Chappel Loan Application did not list any account number for this purported account.) | The CI never provided paperwork to ASKAR reflecting a bank account at North Community Bank or any other bank with this balance. |
| f. | The CI had total assets of $100,000 and total liabilities of $25,788 for a net worth of $74,212. | The CI never provided paperwork to ASKAR supporting the $100,000 asset figure. |
| g. | The purchase price of the property was $318,500 and that the amount in cash to be paid by the CI (the purchaser) was $22,306.38 (the difference between the $318,500 purchase price and the $302,575 loan amount and closing expenses). | The CI told ASKAR that he/she did not have any available cash. |

22.   The Chappel Loan Application is typed and is in a form consistent with that which has been produced using a computer.

23. On or about December 30, 2007, the CI had a telephone conversation with ASKAR. The CI recorded the conversation. The CI told ASKAR that the CI had received the email containing the loan application and asked ASKAR what to do with the application. ASKAR told the CI to sign the application. ASKAR initially asked the CI to email the signed application back to him and then asked the CI to fax the application back to him via a company that converts facsimile transmissions to emails.

24. On or about January 2, 2008, ASKAR met the CI at the CI's residence. The audio portion of the conversation was recorded. During the meeting, ASKAR discussed the CI's purchase of the Chappel Property as well as the CI's purchase of two additional properties located at 1000 East 76th Street, Chicago, Illinois and 6602 South Marquette Road, Chicago, Illinois. The CI gave to the FBI after the meeting a piece of paper on which the CI stated ASKAR had detailed information about each of the three locations. The paper contained the following information, among others, about the three properties:

7952 South Chappel

```
Purchase Price   318,500
Net SALE        -270,000
Gift              48,500
-5% [illegible]   16,000
-Closing costs     5,000
                  27,500 CLEAR
```

1000 E. 76th St.

```
Purchase Price - 288,500
NET SALE      225,000
Gift            63,500
10%           - 28,850
Closing Cost  - 5,000
              29,650 CLEAR
```

6602 S. Marquette Rd

```
Purchase Price - 330,000
Net Sale       - 250,000
GIFT   -         80,000
5%     -         18,000
Closing Costs -   5,000
                 57,000 CLEAR

Total     -  27,000
             29, 650
             57,000
            114,115.00
```

25.  The CI told the FBI that ASKAR stated that the figures $27,500 (7952 South Chappel), $29,650 (1000 East 76th Street) and $57,000 (6602 South Marquette Road) as to the three properties represented the amounts the CI would receive back from ASKAR after the closings on the properties.

26.  The piece of paper ASKAR gave to the CI on or about January 2, 2008 also included information about the number of units in each building, the possible amount of rent to be collected from each unit, and the possible amount of monthly mortgage payments for each building.

27.  ASKAR picked up the signed loan application for the Chappel Property from the CI during the meeting on or about January 2, 2008. This was the only loan application the CI gave to

ASKAR for the Chappel Property and the only loan application the CI signed for the Chappel Property.

28.     On or about January 14, 2008, ASKAR informed the CI by telephone that the closing on the Chappel Property would take place on January 17, 2008. The CI recorded this conversation.

29.     On or about January 15, 2008, the CI had a conversation with ASKAR in which ASKAR told the CI that the closing on the Chappel Property would take place on January 17, 2008 at One North Dearborn, Chicago, Illinois. This conversation was not recorded.

30.     On or about January 16, 2008, the CI had a conversation with ASKAR in which ASKAR told the CI that the closing on the Chappel Property might not go forward on January 17, 2008 because the underwriter had questioned why both ASKAR's name (the seller) and the CI's name (the purchaser) were on the Chase Bank account. ASKAR told the CI that he (ASKAR) had removed his (ASKAR's) name from the account. This conversation was not recorded.

31.     Based on the foregoing, I believe probable cause exists to believe that, on or about December 27, 2007, MHDE ASKAR devised a scheme to defraud and to obtain money by means of materially false and fraudulent representations by knowingly causing an email to be transmitted in interstate commerce for the purpose of executing such scheme in violation of Title 18, United

States Code, Section 1343.

FURTHER AFFIANT SAYETH NOT.

_____
STEVEN T. SECOR
Special Agent
Federal Bureau of Investigation


SWORN and SUBSCRIBED to before
me this 16th day of January, 2008.

_____
MICHAEL T. MASON
U.S. Magistrate Judge
Northern District of Illinois